UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 2:22-CR-20 JD |
| KENNETH YOUNG | |

**OPINION AND ORDER**

Defendant Kenneth Young is charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Mr. Young has filed a motion (DE 60) requesting to dismiss the Indictment or, in the alternative, to exclude from trial various evidence proffered by the Government.[1] As explained below, the Court will grant in part and deny in part Mr. Young's motion. As well, the Court will take the motion to suppress under advisement as it raises additional issues throughout the order which should be addressed by the parties.

**A. Factual Background**

The limited facts below are in the Government's response brief and are found on the video recordings submitted by the Government. They appear to be uncontested by Mr. Young, and he has not requested an evidentiary hearing to determine the veracity of these facts.[2]

---

[1] The motion also requests that the Court dismiss his charge as unconstitutional in light of the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), but the Court has already addressed this matter in a separate Opinion and Order. (*See* DE 70.)

[2] If Mr. Young wishes to contest these facts, he should specify which facts are disputed and request an evidentiary hearing.

On October 5, 2021, Hammond police officers saw Mr. Young near a 2020 Chevrolet Trax parked at Nick's Liquor Store on Hohman Avenue in Hammond.[3] Mr. Young appeared to be drinking and meeting with people in the lot. At that time several reports had been filed indicating that Mr. Young was a suspect in a criminal recklessness shooting a month earlier, on September 11, 2021. Sergeant Gajewski of the Hammond Police Department knew Mr. Young had a suspended driver's license, so when Mr. Young got into his car and left the lot, Sgt. Gajewski initiated a traffic stop.

Mr. Young at first stopped his car and the officers approached it on foot. But as they got close, Mr. Young sped away. He drove through the alley and onto Webb Street with officers pursuing him. As he approached State Line Road to enter Calumet City, Illinois, the Hammond officers called off the pursuit, turned off their lights, and began slowing down. They could still see Mr. Young's car as he drove towards the state line and crashed into a car on the Indiana side of the border. (*See* Gov't Exh. B, DE 63, Body Cam. Rec. 12:44–13:45 (Hammond police officer explaining to Calumet City police officer that the accident took place on the Indiana side of the street).) After hitting the other car, he continued to flee police and his car came to a stop on the Illinois side of the border, still within sight of the Hammond officers on their side of the border. (*See id*.) Once his car came to a stop Mr. Young jumped out of his car and ran away. Hammond officers responded to the crash and attended to the other driver.

Calumet City officers also responded to the scene and officers from both departments began searching for Mr. Young. They found him hiding in a residential backyard. Sometime after Mr. Young was found, a body cam shows two officers discussing his capture:

Officer 1: Where was he, in the backyard?

---

[3] Hammond is located in Indiana and borders Calumet City located in Illinois

2

> Officer 2: Yeah, they found him because the dogs were barking like crazy. I heard those dogs a while ago but I'm like, they are barking because we are all in the area. No, they were barking because the dude was laying there. He was like, digging there too, so we were trying to see if he was hiding a pistol or his work or whatever. If he was smart, he would have dumped that dope before he . . .

(Gov't Exh. B, DE 63, Body Cam. Rec. 34:50.)

Meanwhile, Mr. Young's abandoned car was secured by Hammond police. (Gov't Exh. B, DE 63, Body Cam. Rec. beginning at 3:22.) A responding Calumet City firefighter opened the door and turned off the windshield wipers and engine. A brief conversation can be heard on a body cam recording:

> You guys go through the car all yet or . . . ?
> No, not yet, . . . search warrant for it yet?
> Yeah, don't touch anything in there 'cause we're taking it for a search warrant.

(Gov't Exh. B, DE 63, Body Cam. Rec. 19:39–20:03.)

The car was eventually towed to the Hammond Police Department garage.[4] Neither party has addressed in previous briefing to what extent Hammond police had legal authority to impound the vehicle under these circumstances. Nor have the parties identified the impoundment policies of either police department to demonstrate whether impoundment was consistent with an adopted policy or practice. *See United States v. Cartwright*, 630 F.3d 610, 614 (7th Cir. 2010).

Mr. Young had an outstanding warrant for failure to appear in Calumet City. (Gov't Exh. B, DE 63, Body Cam. Rec. 17:45–18:30.) He was taken into custody on that warrant by the Calumet City police and transported to the Calumet City Police Department. Mr. Young said he

---

[4] In the body cam recording, a Hammond officer is heard explaining to the Calumet City officers that Mr. Young hit the other car just on the Indiana side of the border so it was "going to be "our crash." (Gov't Exh. B, DE 63, Body Cam. Rec. 12:44–13:45.) Besides this statement by the Hammond officer and the fact the car ultimately ended up in the Hammond police garage, it is unclear whether or how Calumet City police acquiesced to the impoundment of the car by Hammond police. *See Pasiewicz v. Lake Cty. Forest Preserve Dist.,* 270 F.3d 520, 527 (7th Cir. 2001) (in determining whether an extra-territorial seizure is reasonable under the Fourth Amendment, acquiescence of host jurisdiction to the seizure is a relevant factor to consider). To the extent they can, the parties should develop this factual issue in their supplemental briefing.

3

did not need medical attention for the car crash. During the booking process, Mr. Young appeared to have difficulty with his shoulder but still denied needing medical attention. However, a short time later, he changed his mind and asked to go to St. Margaret's Hospital in Hammond for shoulder pain. The booking process was not completed and Mr. Young still has a warrant for his arrest in Calumet City.

The Chevy Trax was towed to the Hammond Police Garage. The car was registered to Mr. Young's then-fiancée, GC. Detective Ford interviewed GC. Detective Ford told GC that her car was in police custody and that he wanted her permission to search it. He explained as follows:

> So where I'm at, the thing with your car is, um, there's some stuff that I pretty much know is in it because, you know, the officers relayed to me that they saw it, um and then you know, one thing that I'm interested in that's in there is a phone that I believe belongs to Kenneth. So the other thing that we have to eliminate too is whether or not there is a gun in that car or not, because I'm going to say that you are not ok with him driving up and down Hohman and selling marijuana out of your car, correct? Ok. So there's going to be some stuff in your car and I mean, it's registered to you . . . as far as you know, there's nothing illegal in your car? Ok. You don't keep any drugs in there? Any drugs that we found wouldn't be yours? Any alcohol containers or anything like that? No firearms would be yours? Um, you know obviously, you don't do drugs, you don't need scales or packaging or anything like that? Ok, so that's what we're going to be taking out of there.

(GC Interview Rec. 31:20–33:42.)

GC said she did not use drugs or own a firearm. She told Detective Ford, "You do whatever you need to do with that car." Detective Ford explained that he could apply for a warrant if she did not want to consent and that consent was her right. She signed a consent-to-search form for her car.

Inside the car, officers found a loaded Taurus .357 magnum revolver with an obliterated serial number. They also found two temporary license plates that had been registered to Mr. Young, 24 packages of marijuana and 5 packages of crack cocaine. The drugs were spread out in

the driver side floorboard, dashboard, and in the driver's door pocket. The gun was found in the center console.

Mr. Young was not arrested by Hammond police that day. Instead, charges were filed in Lake County, Indiana, under Cause Number 45G02-2111-F6-02595, and a state warrant was issued for his arrest on December 9, 2021. That said, on November 24, 2001, Mr. Young was arrested in Indiana for a different instance of fleeing from police (arrest warrant issued under Cause Number 45G02-2111-F6-2746). He waived his *Miranda* rights and spoke with officers about various criminal activity. Related to the instant offense, Mr. Young admitted knowing he was a felon and explained he had purchased the revolver found in the Chevy Trax from a "kid" on the streets of Hammond. He told police he paid $300 dollars for the gun and knew the serial number was obliterated.

On February 14, 2022, Mr. Young was arrested under the Indiana state warrant in Cause Number 45G02-2111-F6-02595, which arose from his high speed chase on October 5, 2021. Mr. Young has multiple felony convictions starting in 1992, including for Dealing in Marijuana (45G02-1712-F5-00116), Possession of Controlled Substance (12 CR 0602201), Manufacturing/Delivery of Cannabis (10 CR 0621601), Possession of Controlled Substance with Intent to Deliver (06 CR 0642, 03 CF 01267 and 00 CF 581), Forgery (05 CF 3710), Unlawful Possession of Controlled Substance (04 CF 001717), and being a Felon in Possession of a Weapon (99 CF 1993) (DE 48). Consequently, in March 2022, he was indicted in this district for possessing the Taurus revolver found in the vehicle in violation of 18 U.S.C § 922(g)(1) (felon in possession of a firearm). (DE 1.)

**B.  Discussion**

Mr. Young is asking the Court to dismiss the Indictment on the grounds that the Hammond police officers arrested him in Illinois, yet failed to take him before an Illinois judge for determination of whether there was probable cause to arrest him. Mr. Young argues that the officers violated the Illinois fresh pursuit statute, 725 ILCS 5/107-4(b)-(c), and that, as a result, the instant charge should be dismissed.

In the alternative, Mr. Young is requesting that the firearm found in the Chevy Trax should be suppressed because it was recovered as a result of an unconstitutional search. Likewise, Mr. young is seeking to suppress his confession to Detective Ford, arguing that no substantial evidence corroborates it.[5]

**(1)** *Motion to Dismiss the Indictment*

Mr. Young's motion to dismiss the Indictment hinges on a notion that the Hammond police officers arrested him in Illinois yet failed to take him before an Illinois judge for determination of whether there was probable cause for his arrest. Mr. Young argues that the officers thus violated the Illinois fresh pursuit statute which provides for procedures that must be followed when an out-of-state officer arrests a person in Illinois after a fresh pursuit from another state:

> (b) Any peace officer of another State who enters this State in fresh pursuit and continues within this State in fresh pursuit of a person in order to arrest him on the ground that he has committed an offense in the other State has the same authority to arrest and hold the person in custody as peace officers of this State have to arrest and hold a person in custody on the ground that he has committed an offense in this State.
>
> (c) If an arrest is made in this State by a peace officer of another State in accordance with the provisions of this Section he shall without unnecessary delay take the person arrested before the circuit court of the county in which the arrest was made. Such court shall conduct a hearing for the purpose of determining the lawfulness of

---

[5] In his motion, Mr. Young also includes issues best understood in the context of a motion in limine. The Court will address them below.

> the arrest. If the court determines that the arrest was lawful it shall commit the person arrested, to await for a reasonable time the issuance of an extradition warrant by the Governor of this State, or admit him to pretrial release for such purpose. If the court determines that the arrest was unlawful it shall discharge the person arrested.

725 Ill. Comp. Stat. 5/107-4(b)-(c). Mr. Young argues that he was entitled to extradition proceedings in Illinois before he could be detained in Indiana and that without such extradition his Constitutional rights were violated. Mr. Young does not argue that the Hammond police officers had no probable cause to arrest him following the chase, the car crash he caused, and the flight from the scene of the accident.

In opposing the motion, the Government argues that the Illinois fresh pursuit statute does not implicate the United States Constitution, but the Court need not decide this question because there was no violation of the statute to begin with. *Cf. Akram v. Holder*, 721 F.3d 853, 858 (7th Cir. 2013) ("Judicial restraint requires us to avoid addressing constitutional questions where possible . . . .") (citing *Camreta v. Greene*, 563 U.S. 692, 705 (2011)). When Mr. Young sped away after being stopped by the police officers in Hammond, they started a pursuit but backed off after Mr. Young approached Illinois. Even so, they saw him crash the Chevy Trax into another car in Indiana, cross the state line into Illinois, abandon his car and flee on foot, at which point they came to the aid of the driver of the other car. Sometime later, the Hammond officers tracked Mr. Young to a backyard of a private residence in Calumet City and arrested him.[6] But

---

[6] The Government equivocates whether he was arrested by the Hammond or Calumet City police officers, assuming mistakenly that Mr. Young wasn't in custody until he was turned over to the Calumet City officers. However, under its own facts, it's clear that the Hammond officers were the ones who handcuffed Mr. Young to the point that he was not free to leave and thus effectuated his arrest. *Cf. United States v. Seymour*, No. 2:17CR138-PPS, 2021 WL 389411, at *5 (N.D. Ind. Feb. 4, 2021) (observing that, because handcuffs represent a level of restraint on freedom of movement associated with a formal arrest, the defendant was likely in custody during a brief period he was handcuffed even though his handcuffs were later removed); *see also Lopez v. Grams*, No. 08-CV-408-BBC, 2009 WL 5092866, at *14 (W.D. Wis. Dec. 16, 2009) (finding that the defendant was in custody after an officer found him lying in the grass, drew his firearm, handcuffed, and placed him in the back of the squad car, even though the officer testified he was not in custody at that time, because a reasonable person in defendant's position would

7

they did not take him to Indiana. By now the Calumet City police also responded to the scene of the accident and Mr. Young was handed over to them because he had an outstanding Illinois warrant. The Calumet City officers took Mr. Young to the police station for booking but the booking was not completed because, at Mr. Young's request, he was taken to St. Margaret's hospital in Hammond. Although Mr. Young was brought back to Hammond for medical care, no Indiana authorities arrested him, and his booking at the Calumet City police station was never completed.

Instead, almost two months passed before, in an unrelated case, Mr. Young ended up in police custody in Indiana. On November 24, 2021, Mr. Young was arrested in Indiana for a different instance of fleeing from police (arrest warrant issued under Cause Number 45G02-2111-F6-2746). And it wasn't until February 2022 that Mr. Young was arrested on the charges that arose from his fleeing on October 5, 2021. Then in March 2022, he was indicted in this case and was arrested pursuant to a warrant issued in this district.

Mr. Young has not argued that any of these arrests were invalid. None of them took place in Illinois such as to implicate an extradition, and since each of the arrests was pursuant to a warrant, they are each presumed to be lawful. *See Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019), ("[W]e presume the validity of [the] warrant and the information offered to support it.")

---

have believed that he was not free to leave). But in arresting him, the Hammond police officers did nothing wrong as extra-territorial arrests following a hot pursuit are explicitly authorized by the Illinois statute:

> Any peace officer of another State who enters this State in fresh pursuit and continues within this State in fresh pursuit of a person in order to arrest him on the ground that he has committed an offense in the other State *has the same authority to arrest and hold the person in custody as peace officers of this State have to arrest and hold a person in custody on the ground that he has committed an offense in this State.*

725 Ill. Comp. Stat. 5/107-4(b) (emphasis added). The officers then effectively released him of their custody into the custody of the Calumet City officers who took Mr. Young for booking, but even they released him because he requested medical care and was transported to St. Margaret's hospital in Hammond by the Calumet City Fire Department. Although the parties don't explain what happened next, Mr. Young does not contest the Government's representation that the booking was never completed. Therefore, even if his custody with the Calumet City's officers can be considered an extension of his initial arrest by the Hammond officers, ultimately he was released, instead of being extrajudicially extradited to Indiana.

8

(quoting *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010)). Simply put, as the record stands, while the Hammond officers did arrest Mr. Young in Illinois, he was shortly turned over to the Calumet City police who took him to the Calumet City police station for booking but never finished the process. Mr. Young was never in the custody of Hammond police officers in Indiana on October 5, such that subsection (c) of the Illinois hot pursuant statute was applicable to him. Nor was Mr. Young ever transferred from custody in Illinois to custody in Indiana. Accordingly, his motion to dismiss the Indictment on the basis of violation of the Illinois fresh pursuit statute will be denied.[7]

**(2)** *Motion to Suppress*

Mr. Young also asks the Court to suppress from trial the evidence of a firearm recovered during the search of the car he was driving while fleeing the officers on October 5, as well as his statements made almost two months later that he had bought the firearm on the streets.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Therefore, warrantless searches are prohibited unless the search falls under one of the recognized exceptions to the warrant requirement. *United States v. Denney*, 771 F.2d 318, 320 (7th Cir. 1985). If a warrantless search is conducted, the Government bears the burden to prove that an exception to the warrant requirement existed at the time of the search, or it will be considered unreasonable and unconstitutional. *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001).

---

[7] While inapplicable to the facts here, Mr. Young's argument also turns on a dissenting opinion of the Illinois Supreme Court justice in *People v. Galan*, 289 Ill. 2d 484 (Ill. 2008), which interpreted a nearly identical Indiana fresh pursuit statute. In *Galan*, Illinois police officers arrested a defendant in Indiana and brought him back to Illinois, but the majority held that, because the defendant received a probable cause hearing in Illinois, no constitutional violation occurred.

*(a) Suppression of gun*

As for the gun, Mr. Young argues that the officers searched the car even before they obtained GC's consent but does not proffer any direct evidence in support of this claim. Rather, he insists that Detective Ford admitted as much when he told GC the following:

> So where I'm at, the thing with your car is, um, there's some stuff that I pretty much know is in it because, you know, the officers relayed to me that they saw it, um and then you know, one thing that I'm interested in that's in there is a phone that I believe belongs to Kenneth. So the other thing that we have to eliminate too is whether or not there is a gun in that car or not, because I'm going to say that you are not ok with him driving up and down Hohman and selling marijuana out of your car, correct? Ok. So there's going to be some stuff in your car and I mean, it's registered to you … as far as you know, there's nothing illegal in your car? Ok. You don't keep any drugs in there? Any drugs that we found wouldn't be yours? Any alcohol containers or anything like that? No firearms would be yours? Um, you know obviously, you don't do drugs, you don't need scales or packaging or anything like that? Ok, so that's what we're going to be taking out of there.

Mr. Young believes that the statement repeatedly indicates that, even before GC consented to the search of the car, Detective Ford already knew that there were illegal items in the car which he could have known only if the car had been searched by the officers. He focuses on Detective Ford saying that "there's some stuff that I pretty much know is in [the car] because, you know, the officers relayed to me that they saw it," and assumes that Detective Ford must be speaking of the gun. Yet he ignores the fact that Detective Ford did not make a specific reference to a gun but spoke only of "some stuff," noting in the very next sentence that "the other thing that we have to eliminate too is whether or not there is a gun in that car or not."

Mr. Young also ignores the fact that following the accident the drugs were strewn on the passenger side dashboard, floorboard, and the door compartment, and that one officer used a flashlight to look into the car through its windshield following the accident (Gov't Exh. B, DE 63, Body Cam. Rec. 23:20–30.). So, seemingly, the drugs were in plain view. *Cf. Texas v.*

10

*Brown*, 460 U.S. 730, 739–40 (1983) ("It is likewise beyond dispute that [officer's] action in shining his flashlight to illuminate the interior of [defendant's] car trenched upon no right secured to the latter by the Fourth Amendment."); *United States v. Johnson*, 496 F. App'x 668, 770 (7th Cir. 2012) (police officer's action in looking through car's window with flashlight did not constitute "search"). And if so, then the officers had the right to search the car under the automobile exception right then and there. *See United States v. Wimbush*, 337 F.3d 947, 950 (7th Cir. 2003) ("The search also was proper under the 'automobile exception' to the Fourth Amendment's warrant requirement, which allows police to search a vehicle without a warrant when they have probable cause to believe it contains contraband or evidence of a crime.")

Nor does Mr. Young address the fact that the police suspected him of drug dealing when he was being watched by the police officers. So even if Detective Ford can be considered as affirmatively stating that they had found drugs in the car ("Any drugs that we found wouldn't be yours? Any alcohol containers or anything like that?"), there's still no basis to conclude, relying on that statement alone, that an illegal search took place before the car was searched pursuant to GC's consent. Nothing in Detective Ford's discourse suggests that he knew about a firearm in the car or that he knew about the drugs by some other means than an officer peering into the car through a windshield. At most he contemplates the possibility of finding a firearm and asks GC whether it would be hers if that happens ("No firearms would be yours?"). The same is true of the conversation between the two officers following Mr. Young's capture. It suggests that the officers knew about the drugs, but that's unsurprising given that the drugs were scattered in the car in plain view.

Nonetheless, there seems no reason why the Court should speculate on such potentially critical facts when the parties are quite capable of presenting evidence to fill in the gaps.

11

Frankly, the Court is disappointed that neither side has thus far made an effort to present a full account of the critical facts, either by affidavit or evidentiary hearing, and seems content to leave the determination to speculation. Therefore, the Court directs the parties to present evidence to the Court indicating whether or not the police searched Mr. Young's vehicle before obtaining the consent of GC.

Regardless of whether the officers searched the car before GC's consent, and whether such a search occurred under an automobile exception, the evidence of the gun could be admissible under the inventory exception. "Warrantless inventory searches of cars in police custody are . . . proper as long as the police lawfully have custody of the vehicles." *United States v. Jensen*, 169 F.3d 1044, 1048 (7th Cir. 1999). As well, the search must be reasonable, i.e., conducted as part of a standard policy or procedure incident to arrest. *See Cartwright*, 630 F.3d at 610 ("Both the decision to take the car into custody and the concomitant inventory search must meet the strictures of the Fourth Amendment.") (quoting *United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996)). However, "[t]he existence of a police policy, city ordinance, or state law alone does not render a particular search or seizure reasonable or otherwise immune from scrutiny under the Fourth Amendment." *Id*. (citing *Sibron v. New York*, 392 U.S. 40, 61 (1968) ("The question in this Court upon review of a state-approved search or seizure is not whether the search (or seizure) was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment.")). Inventory searches are allowed "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996) (internal citation and quotation marks omitted); *Cherry*, 436 F.3d at 772.

12

Mr. Young was driving without a license and was fleeing police officers after a traffic stop when he crashed the car. Also, as seen from the body cam video submitted by the Government, the car sustained significant damage and driver's airbag was deployed (Gov't Exh. B, DE 63, Body Cam. Rec. 5:05–25); in addition, the car was blocking the driveway of one of the homes on the street where the accident took place (*id.* 4:33–48). As a result, assuming Calumet City police had a reasonable inventory policy, the car would have been towed and an inventory of the car would have taken place. *Cf. Cartwright*, 630 F.3d at 614–615 ("[T]he IMPD has a comprehensive towing and impoundment policy, which the government introduced at the evidentiary hearing below. The policy sets forth the circumstances under which the police may tow a car, establishes the procedures officers must follow in calling for a tow, requires an inventory search whenever an officer takes a vehicle into custody, and specifically forbids inventory searches 'motivated by an officer's desire to investigate and seize evidence of a criminal act.' . . . As is pertinent here, the IMPD policy permits the impoundment of vehicles 'operated by a non-licensed or suspended driver" or "by [a] person under custodial arrest for any charge.'"). That inventory would have readily resulted in the recovery of both the drugs and the firearm inside the compartment of the car (as noted already, the drugs were strewn over the front passenger area, and the gun, while covered with a napkin, was readily accessible).

While Mr. Young makes an issue that the car was towed to the Hammond police department rather than the Calumet City police department, the outcome would have been the same and the discovery inevitable so long as Calumet City police had a reasonable inventory policy. *See United States v. Stotler*, 591 F.3d 935, 940 (7th Cir. 2010) ("The inevitable discovery doctrine holds that even an illegally seized item need not be suppressed if the government can prove by a preponderance of the evidence that the officers would have discovered it by lawful

means. If the police had not searched [the defendant's] pickup when they did, the evidence would have undoubtedly been discovered a little later. Obviously, with [the defendant] in custody, he was not going to be allowed to get in his truck and drive away. Also obviously, the arresting officers would not have allowed the truck to just sit on the street after [the defendant] was carted away. What they would have done, in all likelihood, was impound the truck and have it towed away. An inventory search would have naturally followed; the evidence would have been inevitably discovered.") (citations omitted); *see also Cartwright*, 630 F.3d at 616 ("In determining whether the inevitable discovery doctrine applies, the court considers a hypothetical situation."). But again, the Court will not speculate on such matters and directs the parties to address this issue by the submission of evidence and further briefing.

(b) *Suppression of statements*

Next, Mr. Young is requesting that the Court suppress his statements made during the interview with Detective Ford. He argues that there is no evidence independent of his confession to show that he possessed a firearm as a felon. He argues that no one saw Mr. Young "exercise direct control over the firearm," "nobody witnessed [him] hold the gun, nobody witnessed [him] load the gun, nobody witnessed [him] shoot the gun, and most importantly, the government has not presented any evidence that [his] fingerprints were found on the gun." (Def.'s Mot. Suppress, DE 60 at 9.) Mr. Young further argues that the car was not his and suggests that his flight from the car after the crash establishes that he did not exercise the requisite control over the gun.[8]

---

[8] In making his argument, Mr. Young invokes the common law "corpus delicti" rule, even as he recognizes that "federal courts do not apply the traditional rule. Rather, 'Corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti' . . . the government may instead introduce 'substantial independent evidence which would tend to establish the trustworthiness of the statement.'" (Def.'s Mot. Suppress, DE 60 at 8 (quoting *United States v. Sterling*, 555 F.3d 452, 456 (7th Cir. 2009).)

14

Unless the firearm ends up being suppressed from evidence, there's more than an uncorroborated confession that favors the Government's case. In fact, there's substantial independent evidence that Mr. Young possessed a firearm after being convicted of a felony. To proceed to trial, the Government need not have the actual proof that Mr. Young committed a crime, even if his confession is discounted; instead, "there must be '*substantial* independent evidence which would tend to establish the trustworthiness of the statement." *United States v. Kerley*, 838 F.2d 932, 940 (7th Cir. 1988) (emphasis added).

Here, such substantial independent evidence is readily available. To be guilty of possession of a firearm Mr. Young did not have to physically hold, load, or shoot the gun as he suggests. Nor are the fingerprints dispositive to whether he possessed it. It's sufficient that he would have had constructive possession of the gun, that is, that he knowingly had the power and the intention at a given time to exercise dominion and control over the gun. *See Henderson v. United States*, 575 U.S. 622, 626 (2015) ("By its terms, § 922(g) does not prohibit a felon from owning firearms. Rather, it interferes with a single incident of ownership—one of the proverbial sticks in the bundle of property rights—by preventing the felon from knowingly possessing his (or another person's) guns. But that stick is a thick one, encompassing what the criminal law recognizes as "actual" and "constructive" possession alike . . . Constructive possession is established when a person, though lacking such physical custody, still has the power and intent to exercise control over the object. . . . Section 922(g) thus prevents a felon not only from holding his firearms himself but also from maintaining control over those guns in the hands of others."); *see also United States v. Garrett*, 903 F.2d 1105, 1110 (7th Cir. 1990).

Constructive possession may be proved by either direct or circumstantial evidence. *Garrett*, 903 F.2d at 1110. Construction possession can be established by demonstrating that a

person exercised dominion and control over the premises where the object in question was found. *See United States v. Taylor*, 728 F.2d 864, 870 (7th Cir. 1984) ("In order to establish constructive possession, the government must produce evidence showing ownership, dominion, or control over the premises . . . in which the contraband is concealed."), quoting *United States v. Alverson*, 666 F.2d 341, 345 (9th Cir. 1982). Here, aside from Mr. Young's confession, substantial evidence shows that he constructively possessed the firearm as he was the driver and the sole occupant of the car where the gun was found following his crash. The gun was located near the gear shifter, easily within the reach of the driver, even though it was covered with a napkin when officers retrieved it. And GC stated to Detective Ford that any gun in the car would not have belonged to her. In any case, the Court must await additional evidence and briefing before deciding this issue, so it will be taken under advisement.

### (3) *Evidence of Defendant's Flight*

Next, Mr. Young is requesting to exclude from trial the evidence of his flight from police. The Government objects, noting that in the Seventh Circuit "juries may properly consider flight as evidence of guilt." (Gov't Resp. Br., DE 62 at 19 (quoting *United States v. Brown*, 664 F.3d 1115, 1119 (7th Cir. 2011).) The Government believes that Mr. Young's "flight and car crash is evidence of his guilt, knowing that he was a felon who had a firearm in the car next to him." (*Id.* at 20.)

The Court finds that while the evidence of Mr. Young's flight may have some relevance to his guilt, such evidence would be unfairly prejudicial and confuse the issues and mislead the jury if admitted for establishing Mr. Young's guilt of the crime charged. There may be many reasons why Mr. Young fled from police: for example, his driver's license was suspended; he

was suspected of dealing drugs moments earlier and of a possible shooting before then; and he had drugs in the car. Any of those reasons may have triggered Mr. Young to flee, and after he crashed the car, he may have had additional motivation to keep going.

Therefore, such evidence is not particularly probative of Mr. Young's consciousness of guilt regarding the firearm. Given that, any probative value is substantially outweighed by unfair prejudice and would confuse the jury if his flight were attributed only to the gun. Interestingly, the Government concedes in its response brief that the drugs and any drug dealing, won't be part of its evidence at trial. As a result, the Court will not allow the flight evidence for establishing his guilt of the crime charged. *See* Fed. R. Evid 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

However, the evidence of Mr. Young fleeing will be allowed to the extent that it's necessary to establish the context of how the officers obtained the firearm. Without such evidence the jury would be confused about what happened moments before the car crash and before Mr. Young darted out of the car. They would also be deprived of evidence that Mr. Young was the only occupant of the car. Accordingly, the Court will allow limited evidence of the chase, but will not allow the Government to argue that the evidence of the flight itself is evidence of Mr. Young's guilt. Accordingly, the Court will grant in part Mr. Young's request concerning the evidence of flight.

**(4)** *Miscellaneous Matters*

Mr. Young has also moved to exclude as irrelevant under Federal Rule 402 the September 11, 2021, shooting at the residence of James and Janelle Moore; any evidence of his possession or sale of marijuana; and the details of his previous convictions. In its response, the Government agrees that these matters should not be part of trial evidence, unless Mr. Young "opens the door" for the admission of this evidence. With that caveat, the Court will grant Mr. Young's motion concerning these matters.

C.  **Conclusion**

For these reasons, the Court GRANTS IN PART, DENIES IN PART, **and TAKES UNDER ADVISEMENT IN PART** Mr. Young's motion (DE 60):

- The motion is GRANTED within the parameters set out in Sections (B)(3) and (4) of this order.
- The motion is DENIED insofar as Mr. Young is requesting **to dismiss the Indictment on the grounds of a violation of the Illinois fresh pursuit statute.**
- The motion is TAKEN UNDER ADVISEMENT **insofar as Mr. Young is requesting to suppress the gun and his statements to Detective Ford concerning the gun.** To this end, the parties are ORDERED to provide <u>evidence</u> and <u>additional briefing</u> concerning—
    - Whether the plain view doctrine applies to the facts surrounding the recovery of the gun that is the subject of the Indictment against Mr. Young;
    - Whether the officers searched the car Mr. Young was driving before GC's consent;
    - Whether the officers had probable cause to search the car Mr. Young was driving irrespective of GC's consent;

- Whether Hammond police had legal authority to impound Mr. Young's car;
- Whether the Hammond Police Department had any policy regarding the impoundment of cars;
- Whether the Calumet City Police Department had any policy regarding the impoundment of cars;
- Whether Calumet City police acquiesced to Hammond police impounding the car Mr. Young was driving and the effect of any such acquiescence;
- Whether Hammond Police Department had a reasonable vehicle inventory policy that was routinely implemented ;
- Whether Calumet City Police Department had a reasonable vehicle inventory policy that was routinely implemented;
- Whether the inevitable discovery doctrine is applicable in this case.

The Government's submissions are due by January 31, 2024, and Mr. Young's responsive submissions are due by February 14, 2024.

SO ORDERED.

ENTERED: January 16, 2024

                                            /s/ JON E. DEGUILIO
                                            Judge
                                            United States District Court